THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ A. TORO ROSAS, Defendant and Appellant.

No. CR-63-17. Decided October 3, 1963.

Mario Báez García for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Nilita Vientós Gastón, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

The crime charged against Toro Rosas in this case is having driven a motor vehicle, on a public highway, under the influence of intoxicating liquor. There was a collision between said vehicle and another, property of Lupercio Mercado Soto, witness for the prosecution. This witness testifies that, in giving artificial respiration to defendant, giving air with his mouth to defendant's mouth "an odor of intoxicating liquors was emitted" from the latter's mouth. Doctor Benjamín Westphal says that on taking defendant's blood sample he perceived "in his breath a suspicious smell, perhaps of having drunk something . . . his breath smelled a little. I cannot say it was alcohol . . . a suspicious smell of some alcoholic liquor." Dr. Westphal testifies that even though defendant had twenty five third-degree burns, "he was conscious, but one cannot say that he was perfectly conscious of everything he did . . . he was not fully conscious," which could be attributed to "a condition of shock due to the injuries and to the *possibility* of alcoholic liquors." Speaking about defendant's mental condition, whether he was unconscious or not, he testified: "In a certain sense I think he was one hundred per cent; he knew his name, where he lived, he knew the names of his family and he knew the people; but to answer other questions about other things, I think he was not completely, although I cannot say what percent . . . but I think that it could be about eighty percent conscious." In regard to his breath the doctor testified: "Well, in my opinion his breath showed that he had drunk some alcohol. Some. I do not know how much he had drunk . . . I do not think that I can reach the conclusion that he is drunk on the basis of his breath."

The blood smear which was obtained with defendant's consent gave a result of 0.13 percent of alcohol, per weight. In the procedure of this blood test the instructions of the Regulation promulgated for its identification, delivery, and verification, were not followed. After the smear was taken the three vials were given to the police instead of being delivered directly by the doctor who took it, or by the director or executive of the state or municipal hospital, or of the health center. Although it is true that the policeman testifies that he gave defendant a vial, the evidence does not specify the precise moment of the delivery nor the person who received it for the defendant. The report is not signed by defendant nor is the third copy of the report given to him, as required by § 1043–5 of the Regulation related with the "blood and urine samples and other proceedings related to chemical analysis"— 9 R.&R.P.R. 300.6A7. What appears from the transcript of the evidence (Tr. Ev. 42–47) is quite eloquent:

"Q.—And you state herein that you gave defendant one smear and two to Dr. Westphal?

A.—I gave him one and the other two to the doctor and he refused to take them and he said that that was the business of the Police Department.

Q.—Then if Dr. Westphal would have testified that he gave them to you, he will be lying?

Prosecuting Attorney: The witness stated that he gave defendant a smear and that he gave the doctor the other two and he did not take them. That means that he had the three of them.

Judge:

Q.—Did the doctor give you the three of them?

A.—He gave me two and I gave one to the defendant.

Q.—And where is the other one?

A.—I do not know what he did with it.

MR. BÁEZ GARCÍA:

Q.—How many smears did you give Dr. Westphal?

A.—I, two only. He did not want them. He said that that was the business of the Police Department.

Q.—How did you get those smears?

A.—He gave them to me.

Q.—How many smears did he give you?

A.—He gave me three and I gave him one.

Q.—When you gave defendant that smear, did you take his signature?

A.—He was disabled, because he was burned.

Q.—Did he talk?

A.—Yes, he talked and understood perfectly well; he was conscious.

Q.—Did he complain of pain?

A.—He complained and he said he was cold.

Q.—You did not take his signature because of his disability?

A.—I could not take it.

Q.—Why?

A.—He was confined to bed and his arms were burned, how could he sign!

Q.—But did he take the smear?

A.—I imagine . . . if he could not sign, I imagine.

Q.—Did he take it physically?

A.—Not physically. I told him: Here is the smear. Then he said 'Put it there' and I put it.

Q.—Who signed for the delivery?

A.—Dr. Westphal signed his, the paper he had to give him.

Q.—Had you intervened in the taking of many blood smears?

A.—No. That was the first one.

Q.—What did you do with the smear the doctor did not want to receive?

Prosecuting Attorney: May it please the court. My colleague is talking in the singular; he is talking in the singular.

MR. BÁEZ GARCÍA: With the smears.

WITNESS: As I was responsible for those smears, since he refused to take them, I took them to Lieutenant Alameda and he sent them immediately to the Department of Health.

MR. BÁEZ GARCÍA:

Q.—How did he send them?

A.—He wrote the name on the same container and he sealed it with a tape.

Q.—By mail?

A.—Yes, sir.

Q.—Immediately?

A.—Yes, sir.

Q.—Do you remember the time when the smears were taken?

A.—Yes, I told you it was between nine thirty and ten.

Q.—Then, were they sent to San Juan that same day?

A.—As soon as I arrived at headquarters, he wrote the address and mailed them immediately.

Q.—But how did you know he had mailed them immediately, if it was not done in your presence?

A.—I took them personally.

Q.—Where did you take them to?

A.—To Hormigueros' post office.

Q.—To whom did you give them?

A.—I dropped them in the box for packages.

Q.—Was the post office opened?

A.—The mail box they have to deposit night mail. The same as in Mayagüez.

Q.—Try to remember, because maybe you are confused. Are you sure it happened as you say?

A.—Yes, sir.

Q.—What time did you mail those smears?

A.—Well, I arrived there about eleven, or between eleven thirty and twelve."

Incidentally it is the irregularity in this transaction which compels the trial court not to admit the report in evidence. See *People* v. *Ramos*, Judgment of June 4, 1963.

 There is no question that the correct identification of the blood smears and urine samples is one of defendant's guarantee in a procedure of this nature. The delivery of the smear to defendant and in case he is disabled, to a relative or friend who may procure the verification for him, and the delivery of a copy of the report to defendant duly signed by the person who took the smear and by defendant himself, are part of a reasonable opportunity of defense within a new method of evidence prepared almost exclusively in the agencies connected with the office of the prosecuting attorney. In this case there is still one more circumstance

in regard to the identification of the smears which deserves to be considered. At the moment of testifying on the contents of the analysis, the expert chemist from the prosecuting attorney refers to sample No. 00300. However, Dr. Westphal, the person who took the smear, refers to sample No. 305-691. It is possible that the error in enumeration is due to a different enumeration in both agencies, but in such case said circumstance should be clearly stated in the evidence.

■ Discarding the expert testimony because of the foregoing irregularities, even though the analysis is favorable to defendant for it is less than 0.15 percent of alcohol, by weight, which is the figure that determines the presumption of the intoxication, the case is reduced to the external signs of said intoxication. The only incrimination is the smell of intoxicating liquor, presented in its two most extreme aspects: "odor" and "suspicious breath" within the inculpatory evidence. The chemical analysis corroborates the second theory better than the first. Lately we have rejected the sufficiency of alcoholic breath to establish the incrimination by itself: *People* v. *Zalduondo Fontánez, ante*, pp. 63, 65 (Blanco Lugo) (1963). The expert doctor of the prosecuting attorney attributes the incoherence in talking to the shock as well as to the possibility of having drunk some intoxicating liquor.

■ This is the typical case which created that dissatisfaction of the conscience, which we know as reasonable doubt.

The judgment appealed from will be reversed and defendant acquitted.